UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,           CRIMINAL NO. 09-20502

                Plaintiff,

    v.                                  HON. MARK A. GOLDSMITH

MATTHEW OWEN TYLER,

                Defendant.

_____/

### United States' Response Opposing
### the Defendant's Motion for Compassionate Release and
### Reduction Of Sentence Pursuant to 18 U.S.C. § 3582(C)(1)(A)(I)

Matthew Tyler is a four-time convicted sex-offender. After sustaining several convictions for sexually assaulting children, Tyler pleaded guilty in this case to trading child pornographic images and videos using file sharing programs on an internet-connected computer. On April 21, 2010, Tyler was sentenced to 200 months in prison.

Tyler now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). In support, he identifies his general fear of Covid-19 in light of several facts: (i) that his medical conditions include Chronic Obstructive Pulmonary Disease (COPD), "possible asthma and lung

damage," and chronic pain; (ii) that he is being housed at FCI Elkton, a facility that has been significantly impacted by Covid-19; (iii) his age—59 years old; and (iv) that he has served over 75% of his sentence. The Court should deny his motion.

Tyler does not satisfy the statutorily mandated criteria for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Tyler's failure to meet the criteria in USSG § 1B1.13 forecloses relief. Even assuming Tyler's COPD would place him at a higher risk of complication if he contracted the virus, his offense and criminal history make him a substantial danger to the community—he has repeatedly been convicted of sex crimes against children and has violated the terms of his supervision on several occasions. Moreover, if released, he plans to reside with his wife, who admitted that she knew about and ignored his possession of child pornography. The danger he poses precludes release under USSG § 1B1.13(2).  And the § 3553(a)

2

factors—which the Court must also consider under § 3582(c)(1)(A)—

likewise do not support release.

Tyler's motion for release should be denied.

## Background

In June 2009, an undercover FBI agent in Tulsa, Oklahoma, using

a computer connected to the internet, launched a publicly available

peer-to-peer (P2P) file sharing program. The P2P program was

configured to download files from one computer at a time. The computer

program also contained an embedded tool that logged the internet

traffic between the FBI computer and any other computer to which it

was connected.

While online, the agent conducted searches for files available for

download from computers that it was communicating with. The search

contained common terms regularly associated with titles given to

images and video containing child pornography traded via the internet.

The FBI agent's search connected to a computer in Lincoln Park,

Michigan, and the agent discovered more than 70 image files available

for download from the Lincoln Park computer containing search terms

associated with child pornography. The undercover agent downloaded

37 files from this computer. Of the 37 files downloaded, 25 of them contained sexually explicit images of children. Further investigation revealed the computer and intent connection were connected to Cheryl Tyler, XXX3 Fort Park Boulevard, Lincoln Park, Michigan.

On July 31, 2009, a search warrant was executed at Tyler's residence in Lincoln Park, Michigan. The FBI seized two computers, numerous hard drives, compact discs and other media during the search. Forensic analysis of the seized electronics revealed over 600 child pornographic images and videos. The files contained sexually explicit conduct involving the sexual assault of minor children by adult males, sado-masochistic conduct, and bestiality. (PSR ¶ 11).

Tyler was interviewed and admitted that he used Limewire and Frostwire, publicly available P2P programs, to download child pornography. The defendant's wife, who was also interviewed at that time, admitted to having seen the defendant view child pornography using the computer. Tyler's wife stated that although it bothered her, she overlooked it because the defendant told her viewing pornography "kept him out of trouble." (PSR ¶12).

4

At the time of his arrest, Tyler had four prior felony and two prior misdemeanor convictions. Three of his prior convictions involved sexual assault or criminal sexual conduct involving children.

On April 21, 2010, Tyler was sentenced below his guideline range of 235 – 293 months to a 200 month sentence, followed by five years of supervised release. He is currently incarcerated at FCI Elkton. He is 58 years old, and has a projected release date of January 14, 2024.

In April 2020, Tyler submitted requests for Compassionate Release/Reduction in Sentence to the warden at FCI Elkton. The Bureau of Prisons considered Tyler's request and determined that Tyler did not meet the criteria to be considered for compassionate release or a reduction in sentence. (Govt. Ex. A - Memo to Tyler from Warden Mark Williams, May 7, 2020). This motion followed.

**Argument**

**I.    The Bureau of Prisons has responded to Covid-19 by protecting prisoners and increasing home confinement.**

**A.    The Bureau of Prisons precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan and continues to execute it. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

6

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits

7

are permitted on a case-by-case basis after the attorney has been screened for infection.

It is true that Tyler is currently incarcerated at FCI Elkton, and that Elkton has been one of the BOP facilities most affected by Covid-19. As a result, however, Elkton has adopted even more stringent measures, outlined in detail in the Sixth Circuit's June 9, 2020, opinion vacating the district court's preliminary injunction in pending civil litigation filed against that institution in the Northern District of Ohio. In vacating the district court's preliminary injunction, the Sixth Circuit noted that

> [t]he BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening everyone for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks.

*Wilson v. Williams*, No. 20-3447, 2020 WL 3056217, at *8 (6th Cir. June 9, 2020). The Court concluded that the petitioners in that case had "not provided sufficient evidence to show that the BOP was deliberately indifferent to the serious risk of harm presented by COVID-19 at Elkton." *Id.* at *11.

The procedures put in place at Elkton have worked, with respect to Tyler. Contrary to Tyler's claim of "next to no virus screening" taking place at Elkton, (R. 17: Motion for Compassionate Release, at PageID.83), Tyler was tested for Covid-19 on May 22, 2020, and the test returned negative, (Gov. Ex. B, Tyler Medical Records 2020, pgs 67–68 of 97 (Sealed)). Thus, Tyler's reliance on his incarceration at Elkton as justification for his release falls flat. *See, e.g.*, *United States v. Sample*, No. 11-20386 (E.D. Mich. May 26, 2020) (denying asthmatic inmate's petition, noting "conditions at FCI Elkton are improving with an increase in testing and a decrease in COVID-19 infection rates. This appears to be due to numerous safety measures implemented by the BOP. Elkton FCI appears to be past the peak of the infection."); *United States v. Peaks,* No. 16-20460 (E.D. Mich. May 7, 2020) (denying compassionate release to an FCI Elkton inmate who is both obese and suffers from hypertension); *United States v. Murphy*, No. 15-20411 (E.D. Mich. May 15, 2020) (denying compassionate release motion of a defendant at FCI Elkton who suffers from respiratory asthma).

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19

completely, despite its best efforts. But the Bureau of Prisons' measures
will help federal inmates remain protected from Covid-19 and ensure
that they receive any required medical care during these difficult times.

### B.   The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by
increasing the placement of federal prisoners in home confinement.
New legislation now temporarily permits the Bureau of Prisons to
"lengthen the maximum amount of time for which [it] is authorized to
place a prisoner in home confinement" during the Covid-19 pandemic.
Coronavirus Aid, Relief, and Economic Security Act (CARES Act)
§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).
The Attorney General has also issued two directives, ordering the
Bureau of Prisons to use the "various statutory authorities to grant
home confinement for inmates seeking transfer in connection with the
ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*
04-03-2020 Directive to BOP, at 1). The directives require the Bureau of
Prisons to identify the inmates most at risk from Covid-19 and "to
consider the totality of circumstances for each individual inmate" in

deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. As of June 10, 2020, over 4,010 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs.

As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will

bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate

for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of

13

Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Tyler's motion for compassionate release.

Tyler's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001).

Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow. *First*, compassionate release requires exhaustion of administrative remedies.[1] *Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate

---

[1] Here, the government does not contest that Tyler has exhausted his administrative remedies.

release, and release must be "consistent with" the Sentencing

Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the

identical language in § 3582(c)(2), compliance with the policy

statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v.*

*United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d

707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical

condition, age-related issue, family circumstance, or other reason that

satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must

"not [be] a danger to the safety of any other person or to the

community," USSG § 1B1.13(2).

Even if a defendant is eligible for compassionate release, the

district court may not grant the motion unless the factors in 18 U.S.C.

§ 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As

at sentencing, those factors require the district court to consider the

defendant's history and characteristics, the seriousness of the offense,

the need to promote respect for the law and provide just punishment for

the offense, general and specific deterrence, and the protection of the

public. 18 U.S.C. § 3553(a).

15

## A.   Tyler is ineligible for compassionate release because he poses a danger to the community.

Tyler's request does not meet the statutory requirements for compassionate release because he poses a significant danger to the community. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020). In both contexts, then, the Sentencing

16

Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

17

## B.    Tyler's stated medical conditions.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. *Raia*, 954 F.3d at 597. Tyler's BOP medical records confirm, however, that he suffers from COPD. (Govt. Ex. B, Tyler Medical Records 2020, pg. 11 of 97 (Sealed)). Although the medical records also indicate that his COPD is "controlled" with medication, COPD qualifies as a "chronic lung disease" that may place an individual at increased risk of Covid-19, under CDC guidance. Therefore, although Tyler receives medication and is regularly monitored for this condition, the government does not dispute that Tyler's COPD, combined with the Covid-19 pandemic, could qualify as an extraordinary and compelling reason for release.

Tyler also claims that he suffers from heart issues that support his release.  Tyler's medical records list "atrial fibrillation – current" for which he is prescribed a low dose aspirin (81mg) and metoprolol (25mg). Tyler's heart condition has been continually and successfully treated with medication since June 2017. (Govt. Ex. C, Tyler Medical Records 2019, pg. 42 of 65) (Sealed). Therefore, Tyler's atrial fibrillation does not

18

qualify as a "serious heart condition," that places him at an increased risk of Covid-19 under the current CDC guidelines.

Next, Tyler lists asthma as a serious medical condition that warrants his release.  But his medical records reveal that Tyler reported no history of asthma on January 16, 2020, (*see* Gov. Ex. B; Tyler Medical Records 2020, pg. 30 of 97) and again on February 6, 2020, (*id.* at p. 23). Furthermore, even if Tyler did suffer from asthma, as Judge Levy recently noted; "as more information has come to light in recent months, '[h]ealth experts have generally seen little to no evidence that asthma increases the risk of developing COVID-19.' Danny Hakim, *Asthma is Absent Among Top COVID-19 Risk Factors, Early Data Shows*, New York Times, (Apr. 16, 2020) https://www.nytimes.com/2020/04/16/health/coronavirus-asthmarisk. *United States v. Brown*, 19-cr-20202, ECF No. 35, (Levy, J. May 21, 2020).

Finally, Tyler suffers from pain related to a genital malady and past surgery associated with the defect. Tyler claims that he has been denied pain medication that was prescribed at a previous BOP facility. (R. 17: Motion for Compassionate Release at 7). But Tyler's medical

records reveal that he was evaluated by Dr. McNutt on May 22, 2020.

Tyler advised medical staff that he discontinued pain medication he felt

was not helpful. Tyler further advised that the medication did provide

pain relief and that he wished to resume taking it. The medication was

again prescribed for Tyler on May 22, 2020. (*See* Gov. Ex. B, Tyler

Medical Records 2020, pg. 3 of 97). Chronic pain, however, is not listed

by the CDC as an increased risk factor if one contracts Covid-19, and

thus is not an extraordinary or compelling circumstance that supports

compassionate release.

Although Tyler was listed on a list of FCI Elkton inmates

identified as "medically-vulnerable" by BOP in the *Wilson* litigation

pending in the Northern District of Ohio, that fact carries little weight

after the Sixth Circuit vacated the district court's preliminary

injunction on June 9, 2020.  In granting the injunction and ordering

BOP to compile the list, the district court instructed that "medically-

vulnerable" inmates are defined as "those identified by the CDC as

being at higher risk."  *See Wilson v. Williams*, No. 20-cv-00794, ECF 22

(N.D. Ohio, Apr. 22, 2020).

But in vacating the preliminary injunction, the Sixth Circuit noted that the district court failed to address BOPs "legitimate concerns about public safety" or "concerns about how released inmates would look after themselves." *Wilson*, 2020 WL 3056217, at *11. Having failed to take these important public safety concerns into account, the Sixth Circuit determined that the district court had abused its discretion. *Id.*

### C.   Tyler poses a danger to the community.

Tyler poses just such a threat to public safety. Even if one or more of Tyler's medical conditions and the Covid-19 pandemic satisfies the initial criteria for eligibility in USSG 1B1.13 cmt. n.1, section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than a mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).

Here, USSG § 1B1.13(2) provides an independent reason to deny Tyler's motion:  he is a danger to others, particularly vulnerable children.  Tyler collected several criminal convictions before the age of

21

30. They began with a burglary at age 17. (PSR ¶12). At age 20, he was convicted of sexually assaulting two eight-year-old girls. (PSR ¶35-36). While awaiting sentencing for that sex offense, Tyler again broke into a business. Tyler was sentenced to three years' probation for the sexual assault and the breaking and entering convictions in 1982. While on probation, he was convicted for yet another breaking and entering. (PSR ¶37-40). In 1989, Tyler again was convicted for physically assaulting a 10 year-old girl by striking her in the face and head when she refused to undress at his command. (PSR ¶41-42). In 1993, Tyler was convicted for sexually assaulting his girlfriend's mentally impaired 10-year-old daughter. He served a 13-year sentence and was released in 2005. In total, before his conviction for the current federal offense, Tyler was convicted of sexually assaulting three children, and attempting to sexually assault a fourth, all who were under the age of 14.

In 2009, Tyler committed the current federal crimes involving his distribution of graphic and violent images involving the sexual assault of children. He committed these crimes notwithstanding his prior sentences of incarceration for sexually assaulting children himself.  His wife—who he now proposes to return to if released—turned a blind eye

22

to these federal offenses as she believed they "kept him out of trouble." (PSR ¶ 12). Tyler has not successfully complied with probation in the past and his state prison sentence was extended to the point of his never receiving parole. He should not be trusted to comply with court orders or supervised release now. With law enforcement resources stretched thin, releasing Tyler to the community would pose a significant danger.

### D.  The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F.

App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Tyler eligible for compassionate release, the § 3553(a) factors should still disqualify him.

*First*, as to the nature and seriousness of the offense, Tyler's conduct involved the collection and distribution of hundreds of images and videos of children being sexually assaulted over the internet. Each of these images represents the memorialization of a felony being committed against a child victim. The existence of the images and videos and their availability to others essentially allows for re-victimization of these children forever—and such re-victimization is virtually guaranteed. Furthermore, the subject matter of these images is directly related to criminal sexual conduct that Tyler has committed in the past. Tyler's offenses are very serious.

*Second*, as to the history and characteristics of the defendant, Tyler is a repeat sex-offender. He has earned the title. Tyler has several prior criminal convictions, including four for sexual assault related offenses since turning 20. He was incarcerated for over 13 years for a prior sexual assault, but that did not stop him from reoffending. He

committed the current offenses while living with his wife, who elected to ignore his behavior.  Moreover, according to the PSR, Tyler has barely worked in his life. (PSR ¶¶ 59-60). Perhaps above all other factors, Tyler's lengthy criminal history and other personal characteristics weigh heavily against his release.

*Third*, as to the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public, those factors likewise favor denying Tyler's motion for release. 18 U.S.C. § 3553(a). Early in his criminal history, Tyler received less severe sentences, but continued to violate the law on release and failed to successfully complete probation. Fully aware that his punishment was increasing over time, he continued to recidivate.  After serving 13 years in state prison for a sexual assault, he returned to crime involving the sexual exploitation of children. Deterring his future crimes, protecting the public (especially vulnerable children) from him, and promoting respect for the law all weigh against release.

**III.   If the Court were to grant Tyler's motion, it should order a 14-day quarantine before release.**

If the Court were inclined to grant Tyler's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Tyler's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ *John N. O'Brien II*
Assistant United States Attorney
211 West Fort St. Suite 2001
Detroit, Michigan 48226
(313) 226-9715
John.obrien@usdoj.gov
P39912

Dated: June 12, 2020

CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2020, I caused the foregoing Government

Response to be filed electronically with the ECF system.  I further certify that the

Government's Response has been mailed by United States Postal Service to the

following non-CM/ECF participant:

Matthew Tyler
#43913-039
FCI Elkton
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 10
LISBON, OH  44432

s/ *John N. O'Brien II*
Assistant United States Attorney